[Sac. No. 5356. In Bank. Feb. 3, 1942.]

Estate of FRANK J. KING, Deceased. FRANK A. KING, Executor, etc., et al., Appellants, v. JOSEPHINE KING, Executrix, etc., Respondent.

Carter, Barrett & Carlton, Daniel S. Carlton, Oliver J. Carter and Ferol Thorpe for Appellants.

George R. Freeman and Elmer Laine for Respondent.

HOUSER, J.—The cause herein was transferred to this court after decision by the District Court of Appeal of the Third Appellate District. Upon examination of the record, we adopt as the decision of this court the opinion of the District Court of Appeal, with such omissions and additions as may hereinafter appear.

"Two sons of Frank J. King, deceased, have appealed from the order settling the final account and directing distribution of his estate. The appellants also seek to review a previous order settling the first annual account of the executors, from which no appeal was taken. . . .

"Frank J. King died testate, December 12, 1936, at San Francisco, leaving surviving him, his widow, Josephine King, two sons, Frank A. and William H. King, and a brother named George W. King. He left a will . . . by the terms of which he appointed his widow and his son Frank as coexecutors. The will purported to dispose of his entire separate property and of all the community property belonging to himself and wife. He willed specific real and personal property [which included farm lands and cattle] to each of his heirs. . . . Letters testamentary were issued to Josephine King and Frank A. King, February 16, 1937. The estate was appraised at $49,142.33. The inventory included two unpaid notes executed by Frank A. King and payable to his father, both of which were matured. One note was for $4,328.10, upon which unpaid interest was then due in the sum of $1,363.83. That note was appraised at $5,691.93. The other note was appraised at $600.00. . . .

"The widow renounced her right to inherit property from the estate of her husband according to the terms of his will, and upon the contrary elected to take her share of the property pursuant to the rules of succession. The executors' first annual account was settled and approved October 21, 1938. In that account the widow was allowed $2,000 extra compensation, to be paid from the assets of the estate. The order making that allowance and settling the account was entered October 21, 1938. No appeal was taken from that order and it became final. Upon application therefor the court also made an award of $100 per month to the widow for a family allowance during the process of administration.

"The final account was settled and distribution of the property of the estate was made and entered September 12, 1939.

At that time the assets of the estate were marshaled and the expenses of administration were properly apportioned against the respective devisees, legatees and heirs in the proportions ascertained from the appraised valuations of the distributive shares received by each one. Besides the several ranches and other personal property on hand for distribution, there was $35,090.37 in cash, received from the sales of [several hundred] horses and cattle and from other sources. The costs of administration were $12,277.53. The portion of the costs assessed against the widow was the sum of $5,295.09.

"All of the cash on hand, the two notes and the three ranches which are involved on this appeal, are community property. Those farms were called respectively the 'Peterich Ranch,' the 'Edgewood Ranch,' and the 'Magoffey Ranch' [the community ownership in the last-mentioned ranch extending only to a two-thirds interest]. By the terms of the will the Peterich Ranch was devised to the widow, together with a legacy of $10,000, one-third of the proceeds from the sales of horses and cattle, and whatever residue remained after the debts and expenses of administration had been paid. The will gave to Frank A. King the Edgewood Ranch, the Magoffey Ranch, together with some other property, and a third of the proceeds from the sales of cattle and horses.

"Having elected to inherit her share of the estate according to the rules of succession, there was distributed to Josephine King the Peterich Ranch, consisting of 314 acres of land, an undivided one-half interest in the Edgewood Ranch, one-third interest in the Magoffey Ranch, one-half interest in two small notes and cash in the sum of $12,930.37, all of which properties distributed to her were her community share thereof, except that she took the entire Peterich Ranch under section 201 of the Probate Code, as community property which was not disposed of by will on account of her renunciation of that instrument.

"In the decree settling the final account and directing distribution to be made, the court charged Frank A. King with the appraised value of the two matured notes as cash in his hands as a coexecutor, aggregating the sum of $6,854.46, which he owed to the estate. From that decree settling the final account and directing distribution of the estate to be made, Frank A. King and his brother William have appealed."

"It is contended the court erred in allowing the executrix extra compensation for services in conducting a cattle business during administration [without a previous order of court therefor]; that the compensation was wrongfully charged against both separate and community property of the estate; that the expenses of administration were improperly apportioned; that the community interests of the deceased in certain real and personal property were illegally distributed to the widow, and that Frank A. King was wrongfully charged as a coexecutor with the appraised value as cash on hand, of [the] two matured notes which he owed the deceased. . . .

"We are of the opinion the allowance of $2,000 as extra compensation for carrying on the cattle business was properly awarded. The will specifically authorized the executors to retain the cattle and horses for a period of 'about one year from the date of the will,' and they were directed to sell them when it was most advantageous to do so. That provision necessarily infers that the business of carrying on the cattle enterprise for a period of at least one year was authorized by the testator. The fact that the widow elected to inherit her share of the estate in accordance with the rules of succession rather than under the provisions of the will, in no way abrogated the independent authorization of the testator to carry on the business until the cattle could be sold to advantage. That provision of the will is nevertheless valid and binding. . . . The will was dated September 26, 1936. On July 12, 1937, a portion of the cattle and horses was sold . . . for $16,776.20. On October 8, 1937, before the year had expired, the court made an order under section 572 of the Probate Code, authorizing the executors to continue the stock business. The following January the balance of the cattle was sold . . . for $12,232.25. There is no evidence the stock could have been sold to advantage before they were actually disposed of. Evidently the business was conducted at a profit, for the horses and cattle were appraised at $16,950. They were sold for the total sum of $29,008.45.

"It is the duty of an executor, with or without an order of court, to take charge of the property of an estate and to preserve it in as good condition as is reasonably possible pending administration. (*Estate of Fulmer*, 203 Cal. 693 [265 Pac. 920, 58 A. L. R. 430]; *Estate of Freud*, 131 Cal. 667 [63 Pac. 1080, 82 Am. St. Rep. 407]; *Estate of Smith*,

118 Cal. 462 [50 Pac. 701]; 11B Cal. Jur. 250, sec. 842; 2 Bancroft's Prob. Pr., 682, sec. 359.) [See, also, *Estate of Meyer*, 11 Cal. App. (2d) 409, 412 (53 Pac. (2d) 984).] In the absence of evidence to the contrary it must be presumed the stock was properly cared for; that the expense of doing so was necessarily incurred, and that the horses and cattle were sold as promptly as was for the best interest of the estate. The court so found. There is evidence to support the finding that these duties were performed.

"The court was authorized under section 902 of the Probate Code, as it existed prior to the amendment of that section in 1939, to allow additional compensation for the feeding and care of 565 head of horses and cattle belonging to the estate. That section then provided in part: 'Such further allowances may be made as the court may deem just and reasonable for any extraordinary services, such as . . . the carrying on of the decedent's business pursuant to the order of the court, and *such other . . . special services as may be necessary for the executor or administrator to . . . perform.'* (Italics added.) It is said in *Reidy* v. *Bidwell*, 70 Cal. App. 552 [233 Pac. 995], at page 555, there is an exception to the general rule that it is not ordinarily the duty of an executor to carry on the business of the testator during the administration of his estate. That exception exists 'where the will of the testator expressly creates the power so to do, or where the carrying on of a business would be cast upon the executor as a necessary means for the preservation of the estate.' " (See, also, *Estate of Maddalena*, 42 Cal. App. (2d) 12 [108 Pac. (2d) 17]; *Estate of Broome*, 162 Cal. 258 [122 Pac. 470]; *Estate of Ward*, 127 Cal. App. 347 [15 Pac. (2d) 901].) And in 11B California Jurisprudence, at page 269, it is stated: "A power to continue decedent's business may be conferred on the executor by will, and the statute providing that the court may authorize such continuance recognizes existing law and merely adds another method of obtaining authority."

"Where a continuation of the business of a deceased person during administration results in a profit to the estate, it has frequently been said the executor is entitled to extra compensation therefor, even though he voluntarily assumes to perform that service. (11B Cal. Jur. 270, sec. 860; 2 Bancroft's Prob. Pr., 788, sec. 419.) In the text last cited it is said: 'Likewise, for management of farm operations, because

of the chance of loss to the estate and personal liability on the part of the representative, *extra compensation may be allowed.*' . . .

"When extra compensation is allowable for such service, the amount which it is proper to fix is within the sound discretion of the probate judge. (*Estate of Broome, supra.*) The amount of extra compensation which has been awarded will not be disturbed on appeal unless it is improperly allowed or clearly appears to be excessive. . . .

■ "Moreover the appellants waived their right of appeal from the order allowing extra compensation, by their failure to give notice of appeal therefrom within sixty days from the time of the settlement of the account. . . . [*Estate of Meyer*, 11 Cal. App. (2d) 409, 412 [53 Pac. (2d) 984]; *Estate of Grant*, 131 Cal. 426 [63 Pac. 731]; *Estate of Fernandez*, 119 Cal. 579 [51 Pac. 851]; *Estate of Ward*, 127 Cal. App. 347, 351 [15 Pac. (2d) 901]; Prob. Code, sec. 1240; 11A Cal. Jur., p. 211.] . . . [On] October 21, 1938, the probate court made and entered its order settling the . . . account. That order specifically found that Josephine King performed valuable services feeding and caring for the cattle; that her special services were worth $2,000, and thereupon allowed extraordinary compensation in that amount. . . . The notice of appeal in this case is from the order settling the final account and making distribution of the estate only, which was made and entered September 12, 1939. . . .

■ "The court properly charged against the distributive share of the estate received by the executor, Frank A. King, [the] two unpaid matured promissory notes executed by him to the deceased in his lifetime . . . [which] were included in the inventory as assets of the estate. The appellants contend that these notes were barred by the statute of limitations, and that they were therefore erroneously charged to the distributive share of the maker of the notes.

"[On] September 5, 1930, for value received, Frank A. King and Grace V. King, executed and delivered to the deceased, Frank J. King, their note for $1,200, payable five years after the date thereof. It was never paid. It became a part of the assets of the estate in the hands of Frank A. King, one of the makers thereof, as a coexecutor of the will of the deceased. It was due and was appraised at $600. It did not outlaw until February 6, 1939. Frank A. King qualified

as executor February 16, 1937. The note was in his hands as an executor of the estate for two years before it outlawed.

"On November 25, 1932, for a valuable consideration, Frank A. King executed and delivered to his father, another note for $4,328.10, due one year after the date of execution. It was secured by a mortgage on real property. The note was never paid. That note did not outlaw until November 26, 1937. It was also in the hands of the maker, as executor, for about three months before it would outlaw.

"Section 602 of the Probate Code charges an executor with obligations which he owes to the testator 'as so much money in his hands.' It provides that such debts shall be included in the inventory, and that the executor is liable therefor. . . .

"The notes executed by the executor which were due and payable, and in his hands as assets of the estate before they were outlawed, become chargeable to him as cash on hand, and they were therefore properly charged, together with the accumulated interest thereon, against his distributive share of the estate. (*Estate of Clary,* 203 Cal. 335 [264 Pac. 242]; *Estate of Miner,* 46 Cal. 564; *Estate of Jones,* 115 Cal. App. 664 [2 Pac. (2d) 483]; *Treweek* v. *Howard,* 105 Cal. 434 [39 Pac. 20]; 11B Cal. Jur. 554, sec. 1100.) In . . . *Estate of Clary, supra,* it is said: ' . . . as pointed out in 16 California Jurisprudence, page 420 *et seq.,* sections 30 to 37, the rule is that the statute of limitations does not run where the parties occupy a fiduciary relationship toward each other, so long as such relationship is not repudiated. . . . [I]rrespective of the lapse of time which would ordinarily bar an action upon the note, the executor, by reason of his fiduciary capacity becoming chargeable with the note in his hands as so much money, is in that capacity precluded from pleading the bar of the statute, and, therefore, so long as the trust relation continues, the statute does not run.'

"It has been held that an executor, by virtue of his fiduciary relationship, is not only chargeable with the principal sum of a note which he owes to the deceased, if it is not outlawed before he accepts that trust, but he is also chargeable with the interest due thereon, as cash in his hands. (*Estate of Miner, supra;* 11B Cal. Jur. 556, sec. 1100.) In *Estate of Miner, supra,* the court says with respect to the obligation of the executor to pay both principal and interest of a note which he owes to the deceased: 'We think there was no error in

charging the administrator with the amount of his own note and the stipulated interest. It is a debt due to the estate and has never been paid. The money has remained in his hands, not separated or set apart from his private funds or been devoted to the uses of the estate. Under what circumstances an administrator will become liable to pay interest is discussed in *Estate of Mary McQueen*, 44 Cal. 584, and upon the principles settled in that case we think the administrator cannot escape the payment of interest.' ''

■ "The appellants contend that the court erroneously directed payment of the family allowance, which was previously granted to the widow under section 680 of the Probate Code, to be charged against the 'devisees and legatees in the proportions that they respectively share in the properties, both community and separate,' upon final distribution. It is asserted the entire amount of family allowance granted to the widow is required to be paid from the *community interests* of the deceased and his widow. We think not. The right of a widow to receive a family allowance, pending the administration of the estate, is purely statutory. (*Hills* v. *Superior Court*, 207 Cal. 666 [279 Pac. 805, 65 A. L. R. 266]; 11A Cal. Jur. 505, sec. 367; 21 Am. Jur. 560, sec. 314; 24 C. J. 230, sec. 758.) The will may direct that a specified sum of money for family allowance shall be paid *from particularly designated property*. (Prob. Code, sec. 750.) The section last mentioned provides that if the designated property 'is insufficient' in value from which to pay the family allowance, the obligation shall be made a charge against 'that portion of the estate not disposed of by the will.' It is further provided that if such designated property is not sufficient for that purpose 'the property given to residuary legatees or devisees shall be resorted to, and thereafter all other property devised and bequeathed is liable for the same, in proportion to the value or amount of the several devises and legacies, but the specific devises and legacies are exempt from such liability if it appears to the court necessary to carry into effect the intention of the testator, and there is other sufficient estate.' ''

It here should be noted that the testator made no reference in his will to the payment either of a family allowance or of any debt or expense of administration, nor did he designate any property out of which such or any expense was to be paid. However, it is the appellants' contention that the provisions

of section 750 of the Probate Code were applicable here,—that under such application all of the community property distributed to the widow was property "not disposed of by the will," and therefore that such property should have been first resorted to for the payment of the family allowance and other expenses of administration.

To recapitulate, by her renunciation of the will, and according to the rules of succession, the widow succeeded to her half of the entire community property, over which portion the husband had no right of testamentary disposition. That portion consisted of: an undivided one-half interest in the Edgewood ranch; a one-third interest in the Magoffey ranch; a one-half interest in the two small notes; and cash in the sum of $12,930.37. In addition thereto, she succeeded to the entire community interest in the Peterich ranch. Her succession to that entire interest was based on her statutory one-half community ownership therein and, pursuant to the provisions of section 201, Probate Code, on her right to succeed to the other half as community property over which her deceased husband's exercise of his right of testamentary disposition became ineffective as a result of her renunciation of the will.

With respect to all the community property to which the widow succeeded solely by virtue of her statutory one-half interest, by operation of law, on the death of her husband such property "belonged to" her as the surviving wife (Prob. Code, sec. 201). It therefore may not be successfully argued that where, as here, the husband attempted to dispose of the wife's community interest it thereafter became property "not disposed of by the will," and that therefore it should have been first resorted to for the payment of family allowance and expenses of administration. Such property never belonged to the husband and the failure of his testamentary disposition thereof could not operate to place it in the category of property "not disposed of by the will." (*Estate of Haselbud*, 26 Cal. App. (2d) 375 [79 Pac. (2d) 443]; *Estate of Marinos*, 39 Cal. App. (2d) 1, 8 [102 Pac. (2d) 443].)

But it is contended by the appellants that, in any event, the community interest in the Peterich ranch over which the testator possessed the right of testamentary disposition, i. e., his community half of such property, having failed as a devise became property "not disposed of by the will." Under the provisions of section 201, Probate Code, in the absence of a

testamentary disposition by a deceased spouse of *his* one-half of the community property, on his death such portion "goes to" the surviving spouse. The husband is charged with knowledge that if he makes a testamentary disposition of the wife's half of the community property the law gives her the right of renunciation of the will, with whatever attendant benefits may flow therefrom. In the present case, one of the effects of the widow's renunciation was to revoke and render inoperative as a devise the decedent's testamentary disposition of his one-half of the Peterich ranch. As another result of her election to renounce the will the widow became entitled to that one-half interest by virtue of the statutory right conferred on her by the provisions of section 201, to receive such property in the absence of an effective testamentary disposition thereof by her deceased husband. The effect of her renunciation of the will was to entitle her to the benefit of the statutes of succession "as fully and completely as if there had been no will." (*Estate of Bump,* 152 Cal. 274 [92 Pac. 643] ; 11A Cal. Jur., pp. 513, 514.) It follows that as to the widow such property cannot be regarded as property "not disposed of by the will" and therefore cannot be subjected first to the payment of family allowance or any other expense of administration.

Moreover, by section 751 of the Probate Code it is provided that *legacies* shall be paid, first, from property expressly appropriated therefor by the will and, secondly, from "property not disposed of by the will." Therefore, were we to accept appellants' contention that in any event the remaining one-half of the Peterich ranch—which because of the widow's renunciation of the will became ineffective as a devise—should be regarded as property "not disposed of by the will," under the provisions of section 751 such property could be taken from the wife and resorted to for the payment of legacies to other persons, a result which, obviously, the legislature never intended should follow from its reference in the several sections of the Probate Code to property "not disposed of by the will."

The appellants also contend that under the provisions of section 202 of the Probate Code it was intended that the *community* property alone should be chargeable with the payment of family allowance and expenses of administration. We do not so interpret the section.

"In *Estate of Finch,* 173 Cal. 462 [160 Pac. 556], it is said at page 464: ' . . . the surviving wife is . . . given the right to have a reasonable allowance made by the court for her support from the estate of her deceased husband, *whether the estate was community property or his separate estate, and irrespective of whether the widow has estate of her own out of which she might support herself.'*

"Section 300 of the Probate Code specifically provides that *'All of his [decedent's] property* shall be subject to the possession of the executor or administrator and to the control of the Superior Court for the purpose of administration . . . *and shall be chargeable with the expenses of administering his estate, and the payment of his debts and the allowance to the family,* except as otherwise provided in this code.' "

And in the case of *Estate of Haselbud,* 26 Cal. App. (2d) 375 [79 Pac. (2d) 443], under the provisions of section 70, Probate Code, the will was revoked as to the surviving wife, and it was contended that the expenses of family allowance and other debts of administration should be paid entirely from community funds to which the widow had succeeded. It was there held that section 750 was not applicable and that, pursuant to the provisions of section 300, such expenses were to be borne ratably by the community and separate property of the decedent.

"A contrary construction of the statute might result in charging the obligation of an estate to pay family allowance to a widow against her own community interest in the property. That construction is opposed to the policy of the law with respect to family allowances. [See note in 98 A. L. R., at page 1326.] . . .

"We conclude that, under the circumstances of this case, the court properly held that the family allowance [as well as other expenses of administration] was chargeable to the assets of the estate without regard to whether it consists of community or separate property of the decedent."

The appellants' separate contention that the court wrongfully distributed to the widow any community property other than that in which she possessed a statutory one-half interest, has been fully discussed hereinbefore.

The decree settling the final account and ordering distribution of the estate is affirmed.

Curtis, J., Edmonds, J., and Shenk, J., concurred.

Carter, J., did not participate herein.

TRAYNOR, J., Dissenting.— I dissent from that part of the opinion upholding the charging of the debts, expenses of administration, and the family allowance against the respective persons interested in the estate in the proportion that each shared in the estate.

Probate Code section 201 provides: "Upon the death of either husband or wife, one half of the community property belongs to the surviving spouse; the other half is subject to the testamentary disposition of the decedent, and in the absence thereof goes to the surviving spouse." Respondent, testator's widow, after renouncing her right to take under the will, succeeded to one-half of all the community property as a matter of right under the above section. She was given all of the Peterich Ranch, which was community property, on the basis of the above section, because her husband, the testator, had failed to make an effective testamentary disposition of his half.

The court charged the debts of the testator and the expenses of administration, including a family allowance to the widow, against the respective persons interested in the estate in the proportion that they shared in the estate. Probate Code section 750 provides: "If the testator makes provision by his will, or designates the estate to be appropriated, for the payment of his debts, the expenses of administration, or family allowance, they must be paid according to such provision out of the estate thus appropriated, so far as the same is sufficient. If insufficient, *that portion of the estate not disposed of by the will*, if any, must be appropriated for that purpose." (Italics added.) The testator did not designate in his will any particular portion of the estate to be used for the payment of his debts, administration expenses, and family allowance. Therefore, under section 750, that portion of the estate not disposed of by will should be resorted to for the payment of these amounts before other portions of the estate are assessed. Since one-half the community property automatically passes to the surviving wife upon the husband's death he has no power to dispose of it by will, and it therefore does not constitute a portion of his estate within the

meaning of section 750. Although it is subject to his debts and administration expenses by virtue of Probate Code section 202, it cannot be first resorted to under section 750. (*Estate of Haselbud,* 26 Cal. App. (2d) 375 [79 Pac. (2d) 443].) The testator, however, has the power to dispose of the other half of the community property by will. If he does not do so, it must be considered a portion of his estate not disposed of by will within the meaning of section 750. If he fails to dispose of it by will, it passes to his wife under section 201, but in this respect it does not differ materially from separate property of which he makes no testamentary disposition. When he does not dispose of some of his separate property by will, it passes to his wife, his wife and children, or to other heirs, according to the laws of intestate succession. The latter half of section 201 simply fixes the intestate succession to the deceased spouse's half of the community property. Thus, if a testator does not dispose of his half of the community property by will it constitutes property not disposed of by will within the meaning of section 750 and must be resorted to first for the payment of debts and administration expenses, if no property is specifically appropriated for this purpose, just as if it were separate property undisposed of by will.

*Estate of Haselbud, supra,* is distinguishable from the present situation. In that case the decedent married after he made his will. His widow was therefore a pretermitted heir; under Probate Code section 70 the will was revoked as to her and she was entitled to her intestate share of the estate. Since section 750 has no application to the estates of persons dying completely intestate, the court, in order to insure the wife's receiving the share of the estate that she would receive if the husband died completely intestate, properly held that the property which the wife took as her intestate share of the estate, including all of the community property, should not be resorted to first for the payment of debts and expenses under section 750, but should be charged for the debts and expenses on the same basis that it would be charged if the husband died completely intestate. In the present case, however, the respondent's renunciation of her right to take under the will does not entitle her to an intestate share of the estate, but merely gives her the right to take her half of the community property free from the testamentary disposition

made of it by the testator. She takes the other half of the Peterich Ranch, not on the theory that her husband died intestate but because after her renunciation it remained undisposed of by will.

In the present case, therefore, one-half of the Peterich Ranch constitutes property undisposed of by the will of the testator and, under section 750, should be resorted to for the payment of debts, administration expenses, and the family allowance, before other portions of the estate are charged.

Gibson, C. J., concurred.